CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 0 2012

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CLARENCE HUNTER | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:12-cv-00113 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| AETNA LIFE INSURANCE COMPANY | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

This ERISA case arises from the decision by Aetna Life Insurance Company ("Aetna") to terminate long-term disability benefits paid to Mr. Clarence Hunter ("Hunter"). Hunter claims that Aetna wrongfully terminated disability benefits owed to him under a group policy plan underwritten by Aetna and offered to Hunter as part of his employment with the Hilton Hotels Corporation. For the reasons set forth below, the court will grant Aetna's motion for summary judgment in its favor.

**I.      Factual and Procedural Background**

Effective January 1, 2007, Aetna issued a group policy to Hilton Hotels Corporation providing eligible employees group life, accidental death, and long-term disability coverage. The long-term disability coverage offers monthly benefits to employees who are "totally disabled," defined as:

You are deemed to be totally disabled while either of the following applies to you:

- During the period which ends right after the first 24 month benefits are payable in a period of total disability:

1

> You are not able, solely because of injury or disease, to perform the material duties of *your own occupation*; except that if you start work at a reasonable occupation you will no longer be deemed totally disabled.
>
> - Thereafter during such period of total disability:
>   You are not able, solely because of injury or disease, to work at *any reasonable occupation*.

(Administrative Record ("AR") at 988) (emphasis added).

Thus, there are two relevant periods for determining "total disability": the first twenty-four month period when a claimant is deemed disabled if unable to work in his or her own occupation, and the period following the first twenty-four months when a claimant is deemed disabled only if he or she is unable to perform any reasonable occupation. The plan defines "reasonable occupation" as "any gainful activity for which you are; or may reasonably become, fitted by education; training; or experience." (Id. at 999.) If an award for disability is granted, the plan requires the claimant to file applications for monetary benefits under any other potentially applicable disability programs, including the federal social security program. (Id. at 992.) Aetna then offsets those awards against payments made under the plan. (Id. at 988.) The plan also notes that Aetna is a fiduciary under ERISA and reserves for itself:

> complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.

(Id. 983.)

In 2007 and 2008, Hunter was an employee of Hilton Hotels Corporation and was eligible for benefits under the plan. He first requested short-term disability in March 2007 after a diagnosis of sarcoidosis by Dr. Michele Ballou, Hunter's pulmonologist for all relevant periods. (Id. at 21-24, 615.) In March of 2008, Hunter submitted another short-term disability claim, complaining of back pain, chest pain, anorexia, anxiety, hypertension, and sarcoidosis. (Id. at

2

80.) Aetna awarded Hunter short-term benefits through October 1, 2008. Hunter's last day of work at Hilton was March 26, 2008. (Id. at 55.) Hunter thereafter requested long-term disability benefits for his illnesses, and in August 2008, Aetna conducted a review to determine eligibility. (Id. at 387.) As part of this review, Aetna received an attending physician's statement ("APS") from Dr. Ballou, which listed a primary diagnosis of "sarcoidosis/hypertension," as well as other diagnoses of lumbar disc disease and anxiety-headaches. (Id. at 756.) Hunter's symptoms included "diffuse pain in joints, muscles, back & chest, fatigue." (Id. at 757.) In a follow-up letter on September 16, 2008, Dr. Ballou wrote:

> [Hunter] has a history of sarcoidosis and severe difficult to control hypertension. The patient was doing quite well, was functioning normally and his disease was in control until April 2008. At that time he had a dramatic increase in symptomatology with severe malaise, fatigue, diffuse joint discomfort, back pain, weight loss and anorexia. His condition has been slow to improve with the patient continuing to complain of severe fatigue and joint pain.
> . . .
> At the present time his pain would not allow him to function for an 8 hour period of time at work. His prognosis is guarded. Most patients with sarcoidosis respond to therapy and ultimately are able to go into remission and live normal lifestyles. Occasionally patients, however, fail to respond and have ongoing symptomatology.

(Id. at 753.)

Aetna also received a job description from Hilton listing Hunter's position as Director of Events. The description listed the physical requirements of the position as follows:[1]

---

[1] The job's essential functions included:
- 40% Directs event management team in the execution of negotiated group sales agreements. This includes directing all aspects of professional team development including recruitment, training, recognition, succession planning, coaching/counseling, performance evaluation, goal setting, incentive plan.
- 25% Maintains an annual account load of 6-25 groups varying in size and complexity.
- 15% Helps provide strategic direction for the hotel by participates [sic] on committees and in meetings, including, but not limited to Department Head, Executive Committee, Revenue Management, Group Pick Up, Food and Beverage, Statement, Quality, Pre and Post Convention Meetings. May also participate in operating department, CVB and sales meetings.
- 15% Directs daily department operations, customer conflict resolution, interaction with National Sales, Sales Technology Support, generation of corporate and hotel level reports, business and market plan developments and implementation, annual and monthly forecast and budget.

3

| Physical Activity | Frequency |
|---|---|
| Sitting | Frequent |
| Walking | Frequent |
| Climbing stairs | Occasional |
| Standing | Frequent |
| Crouching/Bending/Stooping | Occasional |
| Reaching | Occasional |
| Grasping | Frequent |
| Pushing/Pulling | Occasional |

. . .

(Id. at 734.)

After reviewing Hunter's medical files and Dr. Ballou's APS, on October 22, 2008, Aetna approved long-term disability payments to Hunter effective September 23, 2008. (Id. at 394.) Aetna's review concluded that Hunter's "[p]reclusion from work on a full time basis is supported due to sarcoidosis. Records indicate severe fatigue, malaise, weight loss, and diffuse joint and back pain." (Id. at 224.) Aetna continued to receive APSs from Dr. Ballou noting Hunter's inability to return to work due to sarcoidosis throughout the rest of 2008. In February of 2009, Hunter was notified by the Social Security Administration that he would begin receiving social security disability benefits in the amount of $1,082.00 per month. (Id. at 726.)

On May 18, 2009, Dr. Ballou sent Aetna an APS stating that Hunter could return to work with "no restrictions" on May 26, 2009. (Id. at 719-20.) As a result of the APS, Aetna denied Hunter's claim for further benefits, and notified him of his right to appeal the decision. (Id. at 459-50.) On December 9, 2009, Hunter appealed and submitted new records from Dr. Ballou, which noted continued sarcoidosis, as well as right leg pain "likely related to his L5-S1 disk," hypertension, and "[e]xcessive daytime fatigue and sleepiness." (Id. at 716.) The report also

---

| 5% | Travels periodically for the purpose of professional development; customer or industry events, evaluation of revenue and logistics of future meetings; support of Own the Group Market initiatives re: multi-year; internal committee participation; annual conference with discipline. |

(Id. at 733.)

4

stated that Hunter "tried going back to work, but the day he went his BP was high. He was clammy, sweaty, terribly fatigued and was unable to function."[2] (Id.) On January 22, 2010, Aetna overturned its previous denial of benefits, finding that "sufficient documentation exists which supports continued impairment." (Id. at 460.)

Shortly thereafter, Aetna sent Hunter a letter reminding him that the "own occupation" period for his disability determination would end on September 22, 2010, and he would subsequently have to show he was unable to perform "any reasonable occupation" to continue receiving benefits. Aetna advised Hunter to submit medical and vocational records indicating why he was disabled from performing another occupation. (Id. at 488.) On May 13, 2010, Dr. Ballou submitted an APS noting that Hunter was "totally/permanently disabled" and is "drawing Social Security disability." (Id. at 695.) In the section of the APS asking about work limitations and current ability to participate in job training programs, Dr. Ballou wrote "N/A." (Id.) Aetna received another APS from Dr. Ballou on August 6, 2010, noting Hunter's diagnoses of hypertension, sarcoidosis, chest pain, anxiety, and disc disease. Dr. Ballou again indicated that Hunter is "totally/permanently disabled . . . [and] drawing Social Security disability," and responded "N/A" to questions regarding work and training limitations. (Id. at 683.)

Also in August 2010, Hunter's records were reviewed at Aetna's request by Dr. Dennis Mazal to determine if Hunter was disabled from performing "any occupation." Dr. Mazal listed "chest pain, fatigue, high blood pressure, depression . . . chronic fatigue, L5-S1 disc herniation with nerve root compression and radiculopathy, difficulty walking, sarcoidosis and uncontrolled hypertension." (Id. at 674.) The review details Hunter's medical issues and treatment going back to his first disability claim in 2007. Dr. Mazal also contacted Dr. Ballou by phone on

---

[2] Aetna asserts that it was impossible that Hunter tried to return to work since he had been terminated from his position in March 2008. (Defendant's Brief at 1.)

5

August 8, 2010 to discuss Hunter's ability to work. According to Dr. Mazal's notes of the conversation, Dr. Ballou indicated that Hunter's chest x-rays and imaging studies showed improvement in Hunter's sarcoidosis. (Id. at 676.) Dr Ballou also noted that Hunter's hypertension had not caused any significant target organ damage, and that his blood pressure was well controlled during hospitalizations causing her to believe the continued hypertension was a result of "medicinal noncompliance." (Id.) Additionally, Dr. Ballou stated that Hunter's complaints of pain and fatigue had not been corroborated by physical examination or lab studies, and that he had exhibited no sensory motor impairment or dermatomal distribution of pain relating to the L5-S1 disc herniation. (Id.) Finally, Dr. Ballou noted that Hunter had a history of chronic pain, and that sarcoidosis can sometimes cause such pain, but that there was no documentation of arthritis, joint swelling, or decreased range of motion. (Id.)

As a result of his review, Dr. Mazal concluded that the evidence "fail[ed] to support functional impairment for the entire time frame," and that Hunter "should be able to perform the duties of a sedentary, light, and/or medium demand occupation" and perhaps "even a heavy or very heavy demand occupation as long as his blood pressure is maintained . . . ." (Id. at 677-78.) Aetna then forwarded Dr. Mazal's review to Dr. Ballou, who was asked whether she agreed with the assessment that Hunter was able to return to work in a "sedentary, light, medium, heavy and very heavy occupation . . . on full time basis effective 9/23/2010." (Id. at 670-71.) Dr. Ballou replied that she "[a]gree[ed] that [Hunter] could perform sedentary, light duty. His BP control has not been adequate to perform heavy or very heavy work." (Id. at 667.)

Aetna then contracted to have a transferable skills analysis conducted in October 2010 to determine whether there were suitable light or sedentary occupations for someone of Hunter's experience and education. The analysis returned a sample list of positions available within a

6

fifty-mile radius, including: manager reservations, manager apartments, supervisor delivery drivers, supervisory order takers, and sales promotion representatives. (Id. at 657.)

On March 18, 2011, Aetna denied Hunter's claim for continuing long-term disability benefits based on Dr. Mazal's review, his conversation with Dr. Ballou indicating her opinion that Hunter could return to work, and the vocational analysis. (Id. at 541-43.) On May 6, 2011, Hunter appealed Aetna's decision, writing that he had followed up with an orthopedist, Dr. Clare Weidman, for chronic pain in both knees. (Id. at 638.) Hunter had undergone arthroscopic surgery on his left knee in early 2011, and he submitted notes from Dr. Weidman chronicling the surgery and his follow-up appointments. (Id. at 628-37.) Dr. Weidman's notes indicate varying degrees of pain, stiffness, and some quad atrophy. (Id.)

As part of the appeal process, Aetna had two more physicians, Dr. Leonard Cosmo, a pulmonologist, and Dr. Robert Swotinsky, a specialist in occupational medicine, review Hunter's medical records. Dr. Cosmo concluded that there was "a lack of supportive medical documentation to support any significant functional impairment from 11/30/2010 through 8/17/2011, from a pulmonary perspective, that would preclude [Hunter] from functioning within any occupation." (Id. at 603.) Dr. Cosmo noted that there "is no documentation to suggest any exacerbation or worsening of the claimant's condition requiring a significant or frequent usage of increased steroid requirements," and concluded that Hunter could perform a job with a light physical demand level of work. (Id.) Dr. Cosmo twice attempted to contact Dr. Ballou to discuss Hunter's condition by phone but was unsuccessful. (Id. at 595.) Aetna forwarded Dr. Cosmo's report to Dr. Ballou, asking her to respond to Dr. Cosmo's conclusion that Hunter was fit to perform sedentary or light jobs. Dr. Ballou responded in writing that "[f]rom a pulmonary standpoint, I do not believe he is disabled for light duty as noted by your independent reviewer

7

and I would agree with that conclusion. The patient feels that he is unable to perform any job due to degenerative disease in his knees. I would suggest obtaining records from orthopedics [sic] who has been following him in that regard." (Id. at 591.)

Dr. Swotinsky also examined Hunter's files, including the notes from Dr. Weidman regarding Hunter's knee problems. After noting Hunter's history of chronic pain and hypertension, Dr. Swotinsky determined that there was insufficient documentation of illness or symptoms to limit Hunter's ability to work with respect to those conditions. (Id. at 610-11.) Regarding Hunter's knee pain, Dr. Swotinsky noted, "[t]he exam findings are scant, but indicated [Hunter] could still walk and stand unassisted. . . . Obviously he could not work from his surgery date, 2/28/11, onwards until he was recovered." (Id. at 612.) Absent records to the contrary, Dr. Swotinsky put Hunter's recovery period from the surgery at thirty-five days, and concluded that "[t]he file does not otherwise establish limitations precluding performance of light physical demand work." (Id.) Based on his evaluation, Dr. Swotinsky concluded that Hunter would be able to perform light work but was restricted from occupations requiring "repetitive bending, climbing, or heavy lifting." (Id.) Dr. Swotinsky also attempted to contact Dr. Weidman to discuss Hunter's knee problems, but was unsuccessful. Neither Dr. Swotinsky nor anyone at Aetna ever spoke with or received any documentation directly from Dr. Weidman.

By letter dated October 19, 2011, Aetna denied Hunter's appeal, listing twenty-nine documents—mostly medical reports from Hunter's physicians—reviewed as part of the appeal process. (Id. at 558.) The letter indicated that the only physician-recommended restrictions—Dr. Swotinsky's limitations on repetitive bending, climbing, or heavy lifting—were not job requirements of the sample positions listed in the vocational analysis. (Id. at 560.) The letter acknowledged that Hunter had been approved for social security disability benefits, but noted

8

that is a separate determination that may be based on different criteria, and that Hunter had not provided Aetna with any information relating to the social security determination. (Id.) The letter concluded by advising Hunter of his right to bring a civil action under ERISA if he disagreed with Aetna's decision. (Id.)

## II. Discussion

### A. Standard of Review

"In reviewing the denial of benefits under an ERISA plan, a district court first must consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination." DuPerry v. Life Insurance Company of North America, 632 F.3d 860, 869 (4th Cir. 2011). "When a plan by its terms confers discretion on the plan's administrator to interpret its provision and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." Id. (quoting Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 176 (4th Cir. 2005)). Under the abuse of discretion standard, a court "may not disturb a long term disability determination made by [the administrator] so long as its decision is reasonable." Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). "[A]n administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). Substantial evidence is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984). The fact that a plan administrator, acting as a fiduciary, may have a conflict in interest in serving as both the

9

reviewer and payer of claims is "but one factor among many that a reviewing judge must take into account." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008); see also Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 630-31 (4th Cir. 2010) (holding that after the Supreme Court's decision in Glenn, the Fourth Circuit's previous "modified abuse of discretion standard," which had been applicable in cases where the administrator both reviewed and paid claims, was no longer appropriate, and courts should simply apply an unaltered abuse of discretion standard of review).

B. **Analysis**

The Fourth Circuit has "identified eight nonexclusive factors that a court may consider" in determining whether a plan administrator abused its discretion in denying a benefits claim. Those factors are:

> (1) The language of the plan; (2) The purpose and goals of the plan; (3) The adequacy of the materials considered to make the decision and the degree to which they support it; (4) Whether the decision-making process was reasoned and principled; (5) Whether the decision comports with other provisions in the plan and with earlier interpretations of the plan; (6) Whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) Any external standard relevant to the exercise of discretion; and (8) The Administrator's motives or any conflicts of interest it may have.

Champion v. Black & Decker (U.S.), Inc., 550 F.3d 353, 358 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342-43).

Some courts have applied these factors piece-meal, see Wasson v. Media General, Inc., 446 F. Supp. 2d 579 (E.D. Va. 2006) (noting in which party's favor each factor weighed), and others have examined the factors collectively to determine whether the plan administrator's decision was the result of a reasoned and principled process supported by substantial evidence. See DuPerry v. Life Insurance Company of North America, 632 F.3d 860, 869 (4th Cir. 2011).

Hunter's arguments focus on three of the Booth factors: "(3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) [w]hether the decision-making process was reasoned and principled; . . . [and] (8) [t]he Administrator's motives or any conflicts of interest it may have." In evaluating these factors, courts have considered the amount and source of information relied on by plan administrators in denying claims. Decisions based on the reports of multiple, independent physicians who thoroughly evaluated all submitted medical records have been deemed the result of "deliberate and principled" procedures. Wasson, 446 F. Supp. 2d at 597. See Booth, 201 F.3d at 344-45 (holding that consideration of the complete medical records, reliance on independent medical evaluations, and a vocational analysis constituted a principled reasoned process); Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 233-34 (4th Cir. 1997) (holding that a decision based on independent and claimant-submitted medical records and resulting from a "lengthy and thorough" evaluation was the product of a deliberate reasoning process); Donnell v. Metropolitan Life Ins. Co., 165 F. App'x. 288, 294-95 (4th Cir. 2006) (holding that consideration of the complete record, reliance on independent medical evaluations, and assessment of the claimant's vocational capacity amounted to a principled reasoning process). In Donnell, the court outlined the steps taken by the plan administrator:

> MetLife's decision to terminate Donnell's disability benefits resulted from a process that was deliberate and principled. The company's decisionmaking process included a genuine and thorough consideration of all the evidence before it. It reviewed all medical evidence that Donnell submitted, measured Donnell's vocational abilities, procured an independent evaluation of the medical evidence, and considered all of the conditions that Donnell claimed contributed to her disability. Furthermore, MetLife kept Donnell informed of the status of her claim throughout the review . . . .

Id. The court determined that such steps constituted a "deliberate and principled decisionmaking process." Id. at 295.

11

As part of the review process, administrators may also be required to consider whether the claimant has been deemed totally disabled by the Social Security Administration ("SSA"). Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999). SSA determinations are not binding on plan administrators, but they are entitled to some weight. Id. At least one court in the Fourth Circuit has said that when the disability definition under the plan is considerably similar to the social security definition, the plan administrator is required to give the SSA determination "significant weight." Hines v. Unum Life Ins. Co. of Am., 110 F. Supp. 2d 458, 468 (W.D. Va. 2000).

Hunter's main argument is that Aetna abused its discretion by overlooking a number of his illnesses and symptoms, and relying too heavily on the opinions of its reviewing doctors instead of Hunter's examining physicians. Aetna submits that its decision was not an abuse of discretion because it was the result of a "deliberate, principled reasoning process" that was "supported by substantial evidence," Elliot v. Sara Lee Corp. 190 F.3d 601, 605 (4th Cir. 1999), including multiple statements by Hunter's own doctor that he could return to work.

Hunter argues that Aetna's reviewing doctors overlooked his myriad health issues and incorrectly focused on his sarcoidosis as the only disease limiting his ability to work. Specifically, Hunter points out that Dr. Ballou and Dr. Cosmo both couched their statements that Hunter could return to work as coming from a merely "pulmonary perspective," which indiscriminately overlooked his many other diagnosed conditions. (AR at 591, 603.) However, Hunter's argument elides the fact that Dr. Ballou had long been aware of the breadth of Hunter's claimed conditions—she was, in fact, the doctor who diagnosed them. Apart from Dr. Weidman, who treated Hunter for knee problems, Dr. Ballou is the only physician who submitted any statements or documentation on Hunter's behalf regarding his health. Dr. Ballou initially treated

Hunter for a pulmonary condition, sarcoidosis, and monitored him for hypertension, chest pain, lumbar disc disease, anxiety, and other conditions. Her multiple APSs evaluated Hunter's overall health and served as the exclusive basis for granting Hunter short- and long-term benefits. On two separate occasions during the appeals process, Dr. Ballou informed Aetna of her opinion that Hunter could perform light or sedentary work. (Id. at 678) ("Agree that he could perform sedentary, light duty."); (id. at 591) ("As you are aware I follow [Hunter] for sarcoidosis and severe hypertension. From a pulmonary standpoint, I do not believe he is disabled for light duty as noted by your independent reviewer and I would agree with that conclusion."). Additionally, during a phone call with Dr. Mazal, Dr. Ballou remarked upon Hunter's overall health and ability to return to work. The defendants correctly summarize Dr. Mazal's report, in which he notes Dr. Ballou's statements that Hunter:

> suffered no clinically significant target organ damage as a result of uncontrolled hypertension; that plaintiff's subjective complaints of pain and fatigue had not been corroborated by any physical examination findings, laboratory data, or imaging studies; that there was no sensory motor impairment or any dermatomal distribution of pain; that there was no muscle weakness, abnormal gait, loss of muscle tone, or muscle atrophy; that the chest x-rays had shown improvement with respect to the pulmonary sarcoidosis; and that there was no documentation of any clinically tachypnea, tachycardia, hypoxemia, or derangement of pulmonary function mechanics that would preclude plaintiff from performing the duties of any occupation.

(Defendant's Brief p. 10-11) (citing AR at 676.) Dr. Ballou's statements clearly indicate that her opinion that Hunter was capable of returning to work was not limited to a single disease or set of symptoms. Rather, she served as Hunter's primary treating physician during the relevant time periods and her statements regarding his health reflect the broad scope of that treatment.[3]

---

[3] Hunter's argument is further weakened by his own disclaimer of at least some of his alleged conditions. During a phone call with an Aetna representative during the review process, Hunter stated that his claim was not based on "anxiety, stress, CP [chest pain], or anorexia." (Id. at 356.)

13

In addition to Dr. Ballou, Aetna had three independent doctors review Hunter's medical files for objective evidence of disability. Dr. Mazal issued a six-page report chronicling Hunter's conditions and treatment since early 2007. His report discusses, among other things, Hunter's blood pressure readings, medications, MRI and x-ray results, straight leg raising test results, complaints of pain and fatigue, and all of Dr. Ballou's evaluations. (Id. at 673-78.) In reaching the decision that Hunter was capable of performing light or sedentary duty, Dr. Mazal relied on his review of all the available medical records—as well as his conversation with Dr. Ballou, who indicated she believed he was capable of working—and in no way limited himself to a particular disease or set of symptoms.

Dr. Cosmo's review corroborated Dr. Mazal's and Dr. Ballou's opinions with respect to Hunter's pulmonary disorder. (Id. at 604.) He wrote that there appeared to be " a clinically stable benign course of chronic pulmonary sarcoidosis, which has been present for several years." (Id. at 603.) As part of his evaluation, Dr. Cosmo attempted to speak with Dr. Ballou on two separate occasions but was unable to reach her. His report yielded the same conclusion as that of the other doctors—that Hunter was able to return to work. He wrote, "[there is] a lack of supportive medical documentation to support any significant functional impairment from 11/30/2010 through 08/17/2011, from a pulmonary perspective, that would preclude [Hunter] from functioning within any occupation." (Id.)

Hunter also argues that Aetna did not give sufficient consideration to Hunter's knee pain. However, Dr. Swotinsky specifically addressed Hunter's claim on appeal of chronic knee pain relating to degenerative knee disorder and his recovery from arthroscopic surgery on his left knee. His report notes the "scant" exam results from Hunter's visits to Dr. Weidman, and concludes that there was insufficient information in the reports to indicate Hunter could not

14

perform sedentary work. Dr. Weidman's exam reports consist of brief notes following each of Hunter's visits, and they recount varying degrees of pain and mobility.[4] The reports include suggested steps for Hunter's rehab, but never mention anything indicating that Hunter's knee problems rendered him totally disabled. Ultimately, Dr. Swotinsky concluded that Hunter's knee pain would limit him from positions requiring repetitive bending, climbing, or heavy lifting, but did not result in total disability. (Id. at 612.)

Finally, Hunter argues that Aetna did not give sufficient weight to Hunter's claims that chronic pain and fatigue rendered him unable to work. In DuPerry, the Fourth Circuit reversed a plan administrator's decision denying benefits because it concluded the administrator had unjustifiably disregarded the claimant's fibromyalgia and associated pain and fatigue. DuPerry, 632 F.3d at 873. In that case, however, there was clear indication from the claimant's doctor that she was unable to return to work as a result of her condition. The Court noted that her main treating physician twice expressly indicated to the administrator that in his opinion the claimant was disabled from work: "[DuPerry is] not able to work [due to] pain and fatigu[ ]e"; and "she is not able to return to any previous work duties." Id. at 871-72. The Court found that the administrator's doctors had failed to counter the "substantial evidence from [DuPerry's] physicians that [her] diseases do, in fact, prevent her from working." Id. at 873.

Here, a number of the doctors who examined Hunter or reviewed his files did note his complaints of general pain and fatigue. For example, on July 11, 2008, Dr. Ballou reported that Hunter suffered from "diffuse pain in multiple places, back, abdomen, legs . . . ." (AR at 792.) In September of 2008, Dr. Ballou reported that Hunter continued to complain of "severe fatigue

---

[4] The reports include the following statements: "The patient walks with a mild limp, using no assistive device. There is tenderness at the medial joint line." (Id. at 631.) "He has a mild limp today, small effusion . . . . He has quad atrophy as compared to the non-operative leg." (Id. at 633.) "The knee looks good today, has no effusion or any significant erythema." (Id. at 632.) "Overall the knee looks good. There is no effusion. There is minimal crepitus and some tenderness about the medial joint line and some quad atrophy is noted." (Id. at 629.)

15

and joint pain." (Id. at 747.) On July 6, 2009, Hunter complained to Dr. Ballou of pain and excessive fatigue. (Id. at 716.) Additionally, in Dr. Mazal's report, he noted that "[Hunter] does have a history of chronic pain that is generalized and also involves multiple joints . . . ." (Id. at 676.) However, nowhere in the record do any of Hunter's doctors say his pain has disabled him from working. During her conversation with Dr. Mazal, in which she indicated that Hunter could return to work, Dr. Ballou stated that Hunter's subjective complaints of pain had not been corroborated by examination findings. (Id.) Similarly, Dr. Weidman never stated that Hunter's pain, either from his knee or more generally, would render him disabled. Hunter has simply put forth insufficient medical evidence, particularly from his own doctors, indicating that any of his conditions, including chronic pain and fatigue, left him unable to perform any occupation.

In addition to relying on the opinions of multiple medical professionals, Aetna based its decision on the results of a vocational analysis it had commissioned to determine Hunter's suitability, according to his health and experience, for jobs in the national economy. The report concluded that there were ten directly transferable occupations requiring only light or sedentary physical activity for which someone of Hunter's education and experience level could qualify. (Id. at 656.) After Dr. Swotinsky determined that Hunter would have some restrictions due to his knee pain, Aetna resubmitted Hunter's file to its vocational consultant who determined that the physical requirements of the transferable occupations did not conflict with those restrictions. (Id. at 560.) Hunter argues that many of the positions require secondary education he does not possess; however, in fact, those positions merely list college degrees as one type of relevant qualification. For example, the "Manager Reservations" position asks that "Management trainees for larger upscale hotel chains almost always need a bachelor's or master's degree preferably in hospitality or hotel management. If not coming from such a college background,

16

experience working at a hotel is generally required to get a position as a lodging manager." (Id. at 651.) Hunter's former position with Hilton would qualify as this type of experience.

In short, this is not a case where the court is asked to decide between relying on the claimant's doctors, who personally treated a patient and made clear statements regarding his or her inability to return to work, and the opinions of doctors hired by the plan administrator who evaluated health records and made recommendations contradicting the claimant's treating physicians. See Stup v. Unum Life. Ins. Co. of America, 390 F.3d 301, 308 (4th Cir. 2004) (reversing a denial of benefits when faced with conflicting evidence of disability). In this case, Hunter's own physician, the source of the diagnoses upon which Hunter relied for the initial conferral of benefits, has repeatedly stated that she believes Hunter is capable of returning to work. Likewise, Hunter has failed to submit evidence from Dr. Weidman indicating anything about his ability to perform light or sedentary work. Aetna hired three independent doctors to conduct their own review, each of whom attempted to gain more information from Hunter's physicians regarding his conditions, and each of whom determined Hunter could perform at least light or sedentary work.

Aetna's review consisted of an evaluation of the entire medical record, all of Hunter's conditions, the opinions of both the claimant's doctors and independent physicians, and the existence of jobs suited to his health and level of experience. Aetna initially paid long-term disability for two years before receiving information from Hunter's doctor that he was no longer disabled. See Booth 201 F.3d at 344 (finding a plan's reversal of its own decision denying benefits a telling sign of a thoughtful decisionmaking process); Champion, 550 F.3d at 362 (finding that "when the Plan overruled the initial denial of short-term disability benefits . . . it manifested an approach demonstrating an unbiased interest that favored [the claimant]"). Aetna

also kept Hunter well informed throughout the process, advising him of the need to submit additional medical records and his right to appeal. See Brogan v. Holland 105 F.3d 158, 165-66 (4th Cir. 1997) ("[P]laintiff was given a full and fair review of his claim because he was notified of specific reasons for the benefit denial and of the relevant plan provisions."). In light of all this, it cannot be said that Aetna abused its discretion when it terminated Hunter's benefits.

Having determined that Aetna properly considered and evaluated the relevant medical evidence, the court now considers whether Aetna gave appropriate significance to the SSA's determination that Hunter was totally disabled. In its letter notifying Hunter that it was discontinuing his long-term disability awards, Aetna acknowledged that Hunter was receiving social security benefits but stated that:

> [its] disability determination and the SSD determination are made independently and are not always the same. The difference between our determination and the SSD determination may be driven by the Social Security Administration (SSA) regulations. For example, SSA regulations require that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits. Or, it may be driven by the fact that we have information that is different from what SSA considered. We have not been provided with the basis for the SSD determination, and the evidence that was relied on for the SSD determination has not been identified to us. *Therefore, even though you are receiving SSD benefits, we are unable to give it significant weight in our determination* . . . .

(Id. at 539) (emphasis added). Aetna thus acknowledged its responsibility to weigh the SSA determination but was unable to explain why it reached a different conclusion because it lacked any information regarding the award. Hunter began receiving social security benefits in February 2009, before Dr. Ballou's statements that Hunter could return to work. As such, it is possible that Aetna's conclusion was based on a more complete medical record than the SSA's. The only information regarding the social security award in the record before this court is a copy of the letter sent to Hunter informing him of the amount of his benefits and the date he would begin receiving them. (Id. at 726.) The letter includes no explanation for its decision or what

18

information was relied on. Lacking more, Aetna could not fairly be required to give greater explanation for how its decision differed from the SSA's.

## III. Conclusion

As explained above, the court determines Aetna did not abuse its discretion in terminating Hunter's long-term disability benefits. Accordingly, the court grants Aetna's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 20th day of September, 2012.

*/s/ Glen Conrad*
Chief United States District Judge